**Joseph G. Sansone**
**Julia C. Green**
**Gregory R. Bockin**
**Karen M. Klotz**
*Attorneys for Plaintiff*
**SECURITIES AND EXCHANGE COMMISSION**
**One Penn Center**
**1617 JFK Boulevard, Suite 520**
**Philadelphia, PA 19103**
**Telephone: (215) 597-3100**
**Email: klotzk@sec.gov**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> OSKAR ELMGART and RAYMOND LEIBMAN, <br><br> Defendants. | Civil Action No. 2:26-cv-05633 <br><br> JURY TRIAL DEMANDED |

### <u>COMPLAINT</u>

Plaintiff Securities and Exchange Commission ("Commission"), 1617 JFK Boulevard,

Suite 520, Philadelphia, Pennsylvania 19103, files this Complaint against the following two

defendants, whose names and last known addresses are set forth below:

    1.    Oskar Elmgart
            25 Bodwell Terrace
            Millburn, NJ 07041

2.       Raymond Leibman
          459 Passaic Avenue
          West Caldwell, NJ 07006-7428

The Commission alleges as follows:

**SUMMARY OF THE ACTION**

1.       This matter involves insider trading in the securities of Matterport, Inc. ("Matterport") by defendants Oskar Elmgart ("Elmgart") and Raymond Leibman ("Leibman") (collectively, "Defendants") in advance of the April 22, 2024 public announcement that CoStar Group, Inc. ("CoStar") had agreed to acquire Matterport for $5.50 per share for a total transaction value of approximately $1.6 billion.

2.       From on or about April 5, 2024 to April 22, 2024 (the "Relevant Period"), Elmgart and Leibman misappropriated material nonpublic information concerning Matterport's prospective acquisition from a close family member who was an employee of Matterport ("Family Member"). Family Member worked on a commercial agreement relating to the acquisition and learned highly confidential information about the acquisition in the weeks leading up to the announcement.

3.       Both Elmgart and Leibman traded based on the information that they misappropriated from Family Member. Between April 16 and April 19, 2024, Elmgart spent $3,100 to purchase short-term, out-of-the-money Matterport call options. On April 19, 2024, Leibman purchased 10,000 shares of Matterport stock.

4.       On April 22, 2024, after the acquisition was publicly announced, Matterport's stock price increased 176% from $1.74 per share to $4.80 per share.

5.       Elmgart sold his call options after the acquisition announcement for a realized illicit profit of $63,050, a return of approximately 2,000%. Leibman's trading yielded an unrealized illicit profit of $30,581.

2

6. By knowingly or recklessly engaging in the conduct described in this Complaint, Defendants Elmgart and Leibman violated, and unless enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

7. The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon, (c) ordering Defendants to pay civil money penalties, and (d) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

8. The Commission brings this action pursuant to Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1].

9. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa]. The Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the acts, practices, transactions, and courses of business alleged in this Complaint.

10. Venue in this district is proper under Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the acts, practices, transactions and courses of business constituting the alleged securities law violations occurred within this District. The Defendants' trades in Matterport's securities were executed in New Jersey, and both Defendants resided in this District during the Relevant Period.

**DEFENDANTS**

11.     **Oskar Elmgart**, age 52, is a resident of Millburn, New Jersey. He is a non-attorney legal compliance specialist employed at a legal contracting agency.

12.     **Raymond Leibman**, age 80, is a resident of West Caldwell, New Jersey. He is a retired professor who previously worked at a state university.

**RELEVANT ENTITIES AND INDIVIDUAL**

13.     **Matterport, Inc.** was a technology and software company incorporated in Delaware with headquarters in Sunnyvale, California. Prior to its acquisition by CoStar, Matterport's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded under the ticker "MTTR" on the Nasdaq.

14.     **CoStar Group, Inc.** is an online real estate company and provider of commercial and residential real estate information and an online marketplace for commercial real estate and apartment listings. It is a Delaware corporation with its headquarters in Washington, D.C. CoStar's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and is traded under the ticker "CSGP" on the Nasdaq.

15.     **Family Member** was employed in Matterport's legal department during the Relevant Period. Family Member and Elmgart live together.

**TERMS USED IN THIS COMPLAINT**

16.     Common stock is a form of equity ownership in a corporation.

17.     Options contracts are financial instruments that offer the buyer an opportunity to buy or sell, depending upon the type of options contract, an underlying asset such as stock.

18.     A call option is a specific type of options contract that gives the owner the right, but not the obligation, to buy 100 shares of the underlying stock at a set price per share, known as the option's strike price, on or before a set future date, known as the option's expiration date.

4

19.     Generally, the holder of a call option benefits when the price of the underlying stock increases. A trader might purchase a call option if he or she expects the underlying stock's price to exceed the strike price before the expiration date.

20.     A call option is considered "out-of-the-money" when the current market price of the underlying stock is lower than its strike price.

## FACTUAL ALLEGATIONS

**I.     Defendants Elmgart and Leibman Traded on Material Nonpublic Information They Misappropriated from Their Family Member**

**A.     Elmgart and Family Member Teleworked from a Shared Home Office**

21.     During the Relevant Period, Family Member was a remote employee of Matterport. Family Member worked a regular schedule from approximately 9 a.m. to 5 p.m. and almost never worked evening or weekend hours.

22.     Family Member primarily worked from a small home office Family Member shared with Elmgart, who also worked full time from their home. They had separate workstations a few feet apart.

23.     Elmgart had access to Family Member's workspace. In addition to working in the home office, Family Member sometimes worked in the home's kitchen area.

24.     Because Family Member and Elmgart worked from a shared home office, Elmgart could learn the substance of Family Member's work and Family Member trusted him to keep such information private and confidential.

**B.     Background of the Acquisition Negotiations**

25.     In or around September 2023, CoStar and Matterport began negotiating a potential deal whereby CoStar would acquire all outstanding Matterport shares.

5

26.     By early March 2024, CoStar had sent Matterport a draft acquisition agreement, and the companies were conducting due diligence and negotiating the various terms of the acquisition and related transaction documents.

27.     On or about April 3, 2024, CoStar sent Matterport an updated draft of the acquisition agreement and a proposed term sheet to amend and restate an existing commercial agreement between Matterport and CoStar. CoStar requested that the updated commercial agreement be finalized concurrently with the signing of the acquisition agreement.

28.     On or about April 5, 2024, senior leadership within Matterport's legal department, including Family Member's supervisor, met with their CoStar counterparts to discuss the proposed amendments to the commercial agreement.

29.     On or about Friday, April 5, 2024, at 11:03 p.m., Family Member's supervisor called Family Member, told Family Member about the potential acquisition, and asked Family Member to work that weekend on the proposed amendments to the commercial agreement.

30.     Family Member understood that all information about the potential acquisition was highly confidential. Family Member's supervisor stressed the confidentiality of the information and told Family Member that Family Member was only the ninth person in Matterport to learn about the potential acquisition. In fact, Family Member learned of the potential acquisition before some of Matterport's executive leadership team.

31.     The next morning, on Saturday, April 6, 2024, Family Member began working on the commercial agreement portion of the acquisition, including participating in highly confidential video calls. That weekend, Family Member canceled plans with Elmgart and worked in the home office, including while Elmgart was in the house they shared.

32.     Family Member continued to work on the commercial agreement portion of the acquisition the next weekend, April 13 and 14, 2024, from the home office including while Elmgart was in their house.

33.     Family Member worked on the commercial agreement at night and on weekends until it was finalized. Family Member previously had never worked on a weekend while at Matterport.

**C.     Family Member Was Subject to Matterport's Insider Trading Policy**

34.     During the Relevant Period, Matterport had an Insider Trading Compliance Policy, amended February 16, 2023, which outlined employees' responsibilities to refrain from insider trading and implemented procedures to avoid even the appearance of insider trading ("Matterport Policy").

35.     The Matterport Policy covered all employees, members of their households, and other family members whose transactions are directed by the employee or subject to influence or control by the employee.

36.     The Matterport Policy specifically held employees responsible for the trading of these family members and required employees to ensure that their family members complied. The Matterport Policy prohibited trading while in possession of material nonpublic information.

37.     Family Member signed an annual certification on January 22, 2024, acknowledging that Family Member understood and was complying with the Matterport Policy.

**D.     Elmgart Misappropriated Material Nonpublic Information from Family Member and Purchased Matterport Securities**

38.     By late Sunday, April 14, 2024, Elmgart was aware that Family Member had been working nights and weekends and had observed that Family Member had to attend numerous video calls for work at highly unusual hours.

39.    On April 14, 2024, Family Member participated in at least one call relating to the commercial agreement from the home office. At the time of the call, Elmgart was watching television in the living room next to the home office and could overhear the conversation.

40.    The next day, April 15, 2024, Elmgart deposited $1,000 into his brokerage account, which he had not used since May 2021, and which had a balance of less than $10 in cash.

41.    On April 16, 2024, with knowledge of the upcoming Matterport acquisition that he gleaned from overhearing and/or observing Family Member's work, Elmgart spent most of the $1,000 to purchase 100 out-of-the-money Matterport call options.

42.    On April 17 and April 18, 2024, Elmgart deposited an additional $2,000 into his brokerage account and spent most of it to purchase an additional 110 out-of-the-money Matterport call options.

43.    On Friday, April 19, 2024, three days before the acquisition was announced (and the last trading day before the announcement), Elmgart deposited $300 into his brokerage account and spent most of the remaining cash in the account to purchase 50 out-of-the-money Matterport call options.

44.    In total, Elmgart purchased 260 out-of-the-money Matterport call options over 4 days for a total cost of $3,100.

45.    Before the markets opened on Monday, April 22, 2024, Matterport announced that CoStar was acquiring all outstanding shares of Matterport in a cash and stock transaction valued at $5.50 per share ($2.75 cash and $2.75 in shares of CoStar).

46.     Following the announcement, the price of Matterport stock increased dramatically, from $1.74 per share at the close of trading on April 21, 2024, to $4.08 per share at the close of trading on April 22, 2024.

47.     After the announcement on April 22, 2024, Elmgart began selling his Matterport call options. He liquidated his entire Matterport position by the end of the next day, realizing a total profit of $63,050 on his trading, a return of over 2,000% in just one week.

48.     Elmgart did not tell Family Member that he was going to purchase Matterport stock or options before he made his purchases.

49.     On the morning of April 22, 2024, when Family Member showed Elmgart a news report of the acquisition, Elmgart did not disclose his trading. Later that night, when the acquisition was discussed at a holiday dinner, Elmgart again did not tell Family Member about his trading.

E.     **Leibman Misappropriated Confidential Information from Family Member and Purchased Matterport Securities**

50.     Leibman and Family Member have a close familial relationship. During the Relevant Period, Family Member visited Leibman regularly, talked to him via phone and video calls, trusted him with confidential and private information, and sought his opinion on certain work-related issues.

51.     On Sunday, April 7, 2024, approximately 36 hours after Family Member learned of the acquisition negotiations, Family Member visited Leibman at his apartment from approximately 9:30 a.m. to approximately 11:00 a.m. Family Member also called Leibman at approximately 11:14 a.m.

52.     Approximately one hour later, at 12:14 p.m., Leibman called his brokerage company to seek assistance in funding his account, so that he could purchase Matterport stock. Leibman was

9

ultimately unsuccessful in funding his brokerage account and did not purchase Matterport stock that day.

53. Family Member and Leibman continued to communicate via phone and text message throughout the next two weeks. On Sunday, April 14, 2024, Leibman also visited Family Member's home where Leibman could overhear Family Member working in the home office on the commercial agreement.

54. Family Member confided in Leibman that Family Member was working on a commercial agreement that demanded significant time and attention and that Family Member had been responding to a high number of inquiries relating to it.

55. By Friday, April 19, 2024, Family Member learned that the acquisition was almost finalized and that Matterport was planning to announce the acquisition on Monday, April 22, 2024.

56. On the morning of April 19, 2024, Family Member spoke to Leibman via a video call for 25 minutes from 11:26 a.m. until approximately 11:51 a.m. and indicated that Family Member's stressful period at work was ending.

57. At 12:07 p.m., approximately 15 minutes after ending the video call, Leibman called his brokerage company and purchased 10,000 shares of Matterport stock for a total cost of $17,420.

58. On the evening of April 22, 2024, during a holiday dinner, Leibman told Family Member that he had learned of the acquisition and congratulated Family Member. Leibman even relayed to Family Member that he was aware "the stock went up" in response to the acquisition. Although Leibman raised the subject of the acquisition and Matterport's stock price reaction, Leibman did not disclose his trading to Family Member.

59.     By market close on April 22, 2024, Leibman's shares were worth $48,000 and he had generated unrealized illicit gains of $30,580.

## II.     Defendants Elmgart and Leibman Violated the Federal Securities Laws

60.     At all relevant times, both Elmgart and Leibman owed a duty of trust and confidence to Family Mamber, based on their close familial relationship which included a history, pattern, and practice of sharing confidences.

61.     Through his regular interactions with and close proximity to Family Member during the Relevant Period, which allowed him to listen in on and/or observe Family Member's work on the commercial agreement, Elmgart obtained information about the anticipated Matterport acquisition.

62.     Through his regular interactions with and close proximity to Family Member during the Relevant Period, including phone and video calls, text messages, and personal visits to Family Member's home, Leibman obtained information about the anticipated Matterport acquisition.

63.     Elmgart and Leibman knew or were reckless in not knowing that this information about the anticipated Matterport acquisition was material and nonpublic.

64.     Elmgart and Leibman knew or were reckless in not knowing, that Family Member expected them to maintain this information in confidence and not to trade on this information.

65.     By purchasing Matterport call options and/or stock after learning information relating to the acquisition, Elmgart and Leibman each misappropriated material, nonpublic information in breach of a duty of trust and confidence they owed to Family Member.

11

## CLAIM FOR RELIEF
### Fraud in Connection with the Purchase and Sale of Securities
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

66.    The Commission re-alleges and incorporates by reference Paragraphs 1 through 65 above as if fully set forth therein.

67.    By engaging in the conduct described above, Defendants Elmgart and Leibman, directly or indirectly, acting knowingly or recklessly, in connection with the purchase or sale of securities, by the use of means and instrumentalities of interstate commerce, or of the mails, or of a national securities exchange:

    a.   employed devices, schemes, or artifices to defraud;

    b.   made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

    c.   engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

68.    By reason of the actions alleged herein, Defendants Elmgart and Leibman violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

### I.

Permanently restraining and enjoining Defendants Elmgart and Leibman from directly or indirectly engaging in conduct in violation of Section 10(b) of the Exchange Act [15 U.S.C. §

78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5];

## II.

Ordering Defendants Elmgart and Leibman to disgorge all ill-gotten gains and pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

## III.

Ordering Defendants Elmgart and Leibman to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-l]; and

## IV.

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws.

## <u>JURY DEMAND</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands that this case be tried before a jury.

Dated: May 18, 2026

Respectfully submitted,

s/ Karen M. Klotz
Karen M. Klotz (NJ Bar No. 021992001)
Securities and Exchange Commission
Philadelphia Regional Office
1617 John F. Kennedy Boulevard, Suite 520
Philadelphia, PA 19103
Phone: 215-597-3100
Email: klotzk@sec.gov
*Attorney for Plaintiff*
*Securities and Exchange Commission*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| **Plaintiff,** | Civil Action No. 2:26-cv-05633 |
| **v.** | **JURY TRIAL DEMANDED** |
| OSKAR ELMGART and RAYMOND LEIBMAN, | |
| **Defendants.** | |

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I certify that the matter in controversy alleged against the Defendants in the foregoing Complaint is not the subject of any other civil action pending in any court, or of any pending arbitration or administrative proceeding.

s/ Karen M. Klotz
Karen M. Klotz (NJ Bar No. 021992001)
Securities and Exchange Commission
Philadelphia Regional Office
1617 John F. Kennedy Boulevard, Suite 520
Philadelphia, PA 19103
Phone: 215-597-3100
Email: klotzk@sec.gov
*Attorney for Plaintiff*
*Securities and Exchange Commission*

14

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Civil Action No. 2:26-cv-05633 |
| v. | JURY TRIAL DEMANDED |
| OSKAR ELMGART and RAYMOND LEIBMAN, | |
| Defendants. | |

**DESIGNATION OF AGENT FOR SERVICE**

In accordance with Local Civil Rule 101.1(f), the undersigned hereby makes the following designation for the receipt of service of all notices or papers in this action at the following address:

> United States Attorney's Office
> District of New Jersey
> Attention: David E. Dauenheimer
> Assistant U.S. Attorney
> 970 Broad Street, Suite 700
> Newark, NJ 07102

> s/ Karen M. Klotz
> Karen M. Klotz (NJ Bar No. 021992001)
> Securities and Exchange Commission
> Philadelphia Regional Office
> 1617 John F. Kennedy Boulevard, Suite 520
> Philadelphia, PA 19103
> Phone: 215-597-3100
> Email: klotzk@sec.gov
> *Attorney for Plaintiff*
> *Securities and Exchange Commission*

15